IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>BREWER'S LAWN CARE AND PROPERTY PRESERVATION, LLC,<br><br>DEBTOR. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO.: 25-10771-JLC<br>Chapter 11<br>Subchapter V |
| BREWER'S LAWN CARE AND PROPERTY PRESERVATION, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>IDEA 247, INC.,<br>JUSTIN LETO,<br>AND LARRY BASSUK,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | ADVERSARY PROCEEDING NO.: |

**COMPLAINT**

---

Debtor Brewer's Lawn Care and Property Preservation, LLC (hereinafter referred to as the "Plaintiff," or "Debtor"), complaining of Idea 247, LLC (hereinafter referred to as "Idea 247"), Justin Leto (hereinafter referred to as "Leto"), and Larry Bassuk ("hereinafter referred to as "Bassuk") (collectively, "Defendants"), hereby alleges and says as follows:

**PARTIES, JURISDICTION AND VENUE**

1. The Debtor herein filed a voluntary petition under Chapter 11 on June 9, 2025 ("Petition Date").

2. Idea 247 is a Florida corporation with a principal place of business located at 800 NW 62nd Avenue, Suite 750, Miami, Florida 33126.

3. Leto, a Miami, Florida resident, is co-founder and CEO of Idea 247.

4. Bassuk, a Miami Beach, Florida resident, is co-founder and President of Idea 247.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6. This is a core proceeding under 28 U.S.C. § 157(b). The Debtor consents to the entry of final orders or judgment by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

7. Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

8. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 7 inclusive, as if more fully set forth at length herein.

9. This is an action to avoid the incurrence of an illegal, unenforceable usurious loan the Defendant made to the Debtor, to avoid and recover the transfers of property from the Debtor to the Defendant pursuant to §§ 548(a), and 550 of the Bankruptcy Code; and to recover treble damages and attorney's fees from Defendant under 18 U.S.C. § 1964(a) (RICO) for collection of an unlawful debt.

10. Prior to the Petition Date, the Debtor provided roofing services in Tennessee and the surrounding area. The company was led by Craig Glenn Brewer (hereinafter "Brewer"), its owner and sole Member.

## THE AGREEMENT

11. On November 9, 2023, the Debtor – through Brewer – executed a "Revolving Loan Agreement" ("Agreement") with Idea 247, identifying Idea 247 as the "Lender" and Debtor as the "Borrower." A copy of the Agreement is attached hereto as Exhibit A.

12. According to the Agreement, a revolving line of credit was established in a principal amount of up to $211,000, available in advances to Debtor.

13. Each advance is subject to a mandatory "drawdown fee" of 2.99%, which fee is automatically added to the loan balance and itself accrues interest.

14. The Agreement further provides that interest accrues daily at a rate of 0.0699%, equating to 25.5% annually.

15. In the event of a default, the Agreement increases the daily rate to 0.0836%, which is equivalent to approximately 30.5% percent per annum.

16. The Agreement requires repayment on a fixed schedule of equal weekly installments amortized over a 12-month term.

17. Pursuant to the Agreement, Debtor is obligated to repay the full principal, interest, and fees regardless of the success or failure of any business operations.

18. The Agreement also provides that Idea 247 requires Debtor to grant a blanket security interest in all of its assets, as well as personal guarantees from Brewer.

19. The Agreement sets a "Maturity Date," defined as twelve months after the most recent advance, on which any unpaid principal, interest, and fees become immediately due by Debtor.

20. Idea 247 is also authorized under the Agreement to withdraw payments directly from Debtor's bank accounts by electronic debit.

21. Within one week of the Agreement being entered, Idea 247 filed a UCC-1 lien against Debtor for the full amount of the loan, $211,000.00, on November 14, 2023.

22. The Agreement provides a choice of law provision selecting the laws of the Commonwealth of Virginia.

23. As set forth in the Collections Summary that Idea 247 filed in this case, Idea 247 claims that the loan is accruing interest at an interest rate of 30.51% with interest of $82.27 accruing daily and interest of $5,018.25 accruing weekly. [Claim 6, at p. 32].

24. During the 471 calendar days from November 20, 2023 until March 5, 2025, the Debtor transferred a total of $315,640.20 to Idea 247 through ACH debit transactions (hereinafter, "Transfers").

25. Specifically, during the 471 calendar days from November 20, 2023 until January 8, 2024, Debtor made weekly Transfers of $4,366.73 to Idea 247 through ACH debit transactions, making loan repayments totaling $34,933.84, as follows:

| **Date** | **Amount** |
|---|---|
| November 20, 2023 | $4,366.73 |
| November 27, 2023 | $4,366.73 |
| December 4, 2023 | $4,366.73 |
| December 11, 2023 | $4,366.73 |
| December 18, 2023 | $4,366.73 |
| December 26, 2023 | $4,366.73 |
| January 2, 2024 | $4,366.73 |
| January 8, 2024 | $4,366.73 |

26. Commencing January 16, 2024, Debtor's weekly Transfers to Idea 247 increased to $4,594.36.

27. Specifically, from January 16, 2024 until March 25, 2024, Debtor made the following Transfers to Idea 247 totaling $50,537.96:

| Date | Amount |
|---|---|
| January 16, 2024 | $4,594.36 |
| January 22, 2024 | $4,594.36 |
| January 29, 2024 | $4,594.36 |
| February 5, 2024 | $4,594.36 |
| February 12, 2024 | $4,594.36 |
| February 20, 2024 | $4,594.36 |
| February 26, 2024 | $4,594.36 |
| March 4, 2024 | $4,594.36 |
| March 11, 2024 | $4,594.36 |
| March 18, 2024 | $4,594.36 |
| March 25, 2024 | $4,594.36 |

28. From April 1, 2024 until May 20, 2024, Debtor made weekly Transfers of $4,587.87 to Idea 247 totaling $36,702.96:

| Date | Amount |
|---|---|
| April 1, 2024 | $4,587.87 |
| April 8, 2024 | $4,587.87 |
| April 15, 2024 | $4,587.87 |
| April 22, 2024 | $4,587.87 |
| April 29, 2024 | $4,587.87 |
| May 6, 2024 | $4,587.87 |

| | |
|---|---|
| May 13, 2024 | $4,587.87 |
| May 20, 2024 | $4,587.87 |

29. Except as set forth in the paragraph immediately following, from May 28, 2024 until February 24, 2025, Debtor made weekly Transfers of $4,606.90 to Idea 247.

30. Within this period, from July 15, 2024 until August 19, 2024, Debtor's weekly Transfers to Idea 247 changed to $4,602.84.

31. These Transfers from May 28, 2024 until February 24, 2025 totaled $188,858.54 and are as follows:

| **Date** | **Amount** |
|---|---|
| May 28, 2024 | $4,606.90 |
| June 3, 2024 | $4,606.90 |
| June 10, 2024 | $4,606.90 |
| June 17, 2024 | $4,606.90 |
| June 24, 2024 | $4,606.90 |
| July 1, 2024 | $4,606.90 |
| July 8, 2024 | $4,606.90 |
| July 15, 2024 | $4,602.84 |
| July 22, 2024 | $4,602.84 |
| July 29, 2024 | $4,602.84 |
| August 5, 2024 | $4,602.84 |
| August 12, 2024 | $4,602.84 |
| August 19, 2024 | $4,602.84 |

| | |
|---|---|
| August 26, 2024 | $4,606.90 |
| September 3, 2024 | $4,606.90 |
| September 9, 2024 | $4,606.90 |
| September 16, 2024 | $4,606.90 |
| September 23, 2024 | $4,606.90 |
| September 30, 2024 | $4,606.90 |
| October 7, 2024 | $4,606.90 |
| October 15, 2024 | $4,606.90 |
| October 21, 2024 | $4,606.90 |
| October 28, 2024 | $4,606.90 |
| November 4, 2024 | $4,606.90 |
| November 12, 2024 | $4,606.90 |
| November 18, 2024 | $4,606.90 |
| November 25, 2024 | $4,606.90 |
| December 2, 2024 | $4,606.90 |
| December 9, 2024 | $4,606.90 |
| December 16, 2024 | $4,606.90 |
| December 23, 2024 | $4,606.90 |
| December 30, 2024 | $4,606.90 |
| January 6, 2025 | $4,606.90 |
| January 13, 2025 | $4,606.90 |
| January 21, 2025 | $4,606.90 |
| January 27, 2025 | $4,606.90 |

| | |
|---|---|
| February 3, 2025 | $4,606.90 |
| February 10, 2025 | $4,606.90 |
| February 18, 2025 | $4,606.90 |
| February 24, 2025 | $4,606.90 |

32. On March 3, 2025 and March 5, 2025, Debtor made Transfers of $2,303.45 to Idea 247, totaling $4,606.45.

33. Even if Debtor took drawdowns to the maximum amount permitted under the Agreement of $211,000, the Transfers from Debtor to Idea 247 of $315,640.20 over the course of 471 days would reflect an interest rate of 38.43%.[1]

34. Incredibly, Idea 247 has filed a Proof of Claim in this case seeking an additional $98,404.99 from Debtor under the Agreement, in addition to the $315,640.20 Debtor has already paid to Idea 247 [Claim 6].

35. The amount sought by Idea 247 would increase the interest rate to 52.58%.[2]

## INSOLVENCY

36. At the time of the Transfers, the Debtor was insolvent and could not meet its obligations.

[1] Interest Amount ($104,640.20, the difference between the $211,000.00 loan principal and the $315,640.20 repaid) = Principal Amount ($211,000.00) x Rate of interest (here the variable to be calculated) x Time in years (471 days, which is 1.29041 years).

[2] Interest Amount ($203,045.19, the difference between the $211,000.00 loan principal and the $414,045.19 that Idea 247 claims is owed ($315,640.20 repaid + additional $98,404.99 Idea 247 seeks)) = Principal Amount ($211,000.00) x Rate of interest (here the variable to be calculated) x Time in years (668 days as of the date of this filing, which is 1.8301 days).

37. According to the Debtor's internal financial statements, at the end of November 2024, the Debtor had negative equity (the Debtor's assets were exceeded by its liabilities).

38. The Debtor's Chapter 11 schedules reflect assets totaling $50,619.00 and liabilities totaling $281,502.00.

39. At all times between November 20, 2023 and the June 9, 2025 Petition Date, the Debtor was insolvent.

40. Section 2.1 of the Agreement provides that future advances may be suspended at lender's discretion, "if through its ongoing monitoring of Borrower's financial condition, Lender determines that there has been a material adverse change."

41. As part of the underwriting for the Agreement, the Debtor provided financial information to Idea 247.

42. Through the underwriting and ongoing monitoring conducted by Idea 247, Defendants knew, or should have known, of the insolvency of the Debtor at the time of the Agreement.

43. As part of the underwriting for the Agreement and ongoing monitoring conducted by Idea 247, Defendants knew or should have known that Debtor had Merchant Cash Advances ("MCAs") outstanding at the time of the Agreement and at the time of each drawdown.

## FIRST CLAIM FOR RELIEF

(Avoidance of Constructively Fraudulent Obligation – 11 U.S.C. § 548(a)(1)(B))

44. Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs as if more fully set forth at length herein.

45. Illegal, unenforceable debts cannot provide reasonably equivalent value. *See Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) ("a transaction

that is illegal under the laws of the State [ ] will not support 'value' for purposes of sections 548 or 550.").

46. The incurrence of the Agreement did not provide reasonably equivalent value to the Debtor.

47. The Agreement states that it charges the Debtor an approximate annual rate of interest, before any advances occurred, of about 25.5%.[3] [Exhibit A at Section 2.2].

48. However, as set forth below, the interest rate is actually more than 38%.

49. In the event of a default, the Agreement charged Debtor a higher annual rate of interest of about 30.5% interest, exclusive of fees and interest accrued in connection with advances.[4] [Exhibit A at Section 2.2].

50. In addition to these rates, each advance from Idea 247 to Debtor was subject to a mandatory 2.99% drawdown fee added to the loan balance, which also accrued interest.

51. The incurrence of the Agreement should be avoided under as it did not provide reasonably equivalent value to the Debtor.

52. This Court should declare that the incurrence of the Agreement should be avoided under 11 U.S.C. § 548(a)(1)(B) as the Agreement did not provide reasonably equivalent value to the Debtor, is illegal, unenforceable, and void under Tennessee law.

53. The Tennessee Department of Financial Institutions sets a maximum effective formula interest rate of 11.50% per annum, with higher rates of up to 24% permitted for certain commercial loans.

---

[3] The Agreement provides for daily interest rate of 0.0699%. Simple interest is therefore about 25.5% ($0.000699 \times 365 = 0.255 \approx 25.5\%$).

[4] In the event of a default, the daily rate increases to 0.0836%, which would be simple interest of about 30.5% per annum ($.000836 \text{ x } 365 \approx 30.5\%$).

54. Under Tennessee Code §47-14-117, if a loan contract on its face requires payment of usurious interest or excessive fees, the contract is unenforceable.

55. Specifically, Section 47-14-117(c)(1) provides that, where a court finds that "the lender or creditor has been guilty of unconscionable conduct in a transaction by taking interest, loan charges, commitment fees, or brokerage commissions in excess of the limitations fixed by statute, that lender or creditor shall not be entitled to recover any interest, loan charges, commitment fees, or brokerage commissions with respect to that transaction, and shall be required to refund to the borrower or debtor any loan charges, commitment fees, or brokerage commissions, and twice the amount of any interest collected with respect to that transaction, and the borrower shall be entitled to recover reasonable attorneys' fees from the lender."

56. Here, the interest rate charged is higher than the cap on interest under Tennessee law and accordingly, the Agreement is void and Plaintiff is entitled to relief from the Defendants.

**SECOND CLAIM FOR RELIEF**

(Avoidance of Constructively Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(B))

57. Plaintiff repeats and re-alleges the allegations set forth above inclusive, as if more fully set forth at length herein.

58. An unenforceable agreement cannot serve as an antecedent debt. The Bankruptcy Code defines a "debt" as "liability on a claim." 11 U.S.C. § 101(12). No liability can be established on an unenforceable claim; therefore, the Agreement cannot serve as an "antecedent debt" for the payment made by the Debtor.

59. Additionally, with the Agreement being avoided under 11 U.S.C. § 548(a)(1)(B), the Debtor's payments on the avoided Agreement were made without receiving reasonably equivalent value. *See e.g. Redmond v. Spiritbank (In re Brooke Corp.)*, 541 B.R. 492, 507 (Bankr. Kan. 2015) ("If the court avoids an obligation under section 548, transfers made by the debtor on

account of that obligation are not made for reasonably equivalent value, and may be set aside as actually or constructively fraudulent.") (citation and quotation omitted). *See also Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest., Inc.)*, 337 B.R. 495, 502 (Bankr.S.D.N.Y.2006); *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) ("a transaction that is illegal under the laws of the State [ ] will not support 'value' for purposes of sections 548 or 550.").

60. The Transfers were made within two (2) years of the June 9, 2025 Petition Date.

61. The Transfers were a transfer of an interest of the Debtor in property.

62. For the reasons alleged herein, the Debtor was insolvent on the date that the Transfers were made or became insolvent as a result of such Transfers.

63. At the time of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or transactions, for which any property remaining with the Debtor was an unreasonably small capital.

64. At the time of the Transfers, the Debtor intended to incur, or believed that the Debtor would incur, debts that were beyond the Debtor's ability to pay as such debts matured.

65. Moreover, receiving $211,000 and repaying $315,640.20 over the course of 471 days is not reasonably equivalent.

66. The payments totaling $315,640.20 made by the Debtor on account of the Agreement are avoidable as a constructively fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B), and the Plaintiff is entitled to avoid the Transfers for the benefit of the estate.

## THIRD CLAIM FOR RELIEF
(Recovery of Avoided Transfers – 11 U.S.C. § 550(a)(1))

67. Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs inclusive, as if more fully set forth at length herein.

68. Pursuant to the Agreement, Debtor could drawdown up to the maximum amount of $211,000, Debtor received loan funds from Idea 247, and Debtor made Transfers totaling $315,640.20 to Idea 247. These transfers were avoidable under 11 U.S.C. § 548(a)(1).

69. Idea 247 was the initial transferee of the avoidable transfers it received from the Debtor and the avoidable transfers made to Idea 247 were for the benefit of the Defendants.

70. Plaintiff seeks a judgment against Idea 247 in the amount of the $315,640.20 in avoidable transfers received by Idea 247 under 11 U.S.C. § 548, plus pre-judgment interest at the legal rate until judgment is entered.

**FOURTH CLAIM FOR RELIEF**
(Violations of RICO – 18 U.S.C. § 1962)

71. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 68 inclusive, as if more fully set forth at length herein.

**A. The Unlawful Activity**

72. More than a dozen states, including Tennessee, place limits on the amount of interest that can be charged in connection with providing a loan.

73. Idea 247 issues usurious loans under the guise of legitimate loans to borrowers, like Plaintiff, facing financial duress and who lack sophistication of experienced borrowers and are unaware of predatory lending tactics.

74. Idea 247 ensured they had recourse in the event Debtor declared bankruptcy or were placed in involuntary bankruptcy by entitling them to enforce the personal guaranty against Brewer in the full amount of the loans.

75. The loan from Idea 247 to Debtor was for more than 38% interest.

**B. Culpable Persons**

76. Leto and Bassuk are each a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that Leto and Bassuk are each either an individual, corporation, or limited liability company capable of holding a legal interest in property.

77. At all relevant times, Leto and Bassuk each were, and are, a person that exists separate and distinct from the Enterprise, described below.

78. Leto is the CEO and has an ownership interest in Idea 247 and is the mastermind of the Enterprise.

79. Through his operation of Idea 247, the RICO Person did solicit, underwrite, service, fund and collect upon unlawful debt incurred by small business in states that do, and states that do not, have usury laws.

**C. The Enterprise**

80. Leto, Bassuk, and Idea 247 constitute an enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

81. Leto, Bassuk, and Idea 247 are associated in fact and through relationships of ownership for the common purpose of carrying an ongoing unlawful enterprise. Specifically, the Enterprise has the common goals of soliciting, funding, servicing and collecting upon usurious loans that charge annual interest rates at more than the enforceable rate under the laws of Tennessee and other states.

82. Since at least 2023 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating,

underwriting, servicing, and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

83. The debt, including such debt evidenced by the Agreement, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes; and (ii) the rates are more than the legal rate permitted under Tennessee law.

### D. The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the Individual Companies within the Enterprise

84. The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a common structure to operate as a unit in order to accomplish the common goal and purpose of collecting upon unlawful debts as including as follows:

#### 1. Leto

85. Leto was the CEO of Idea 247 in December 2024 and has been the Executive Chairman of Idea 247 since January 2025, and together with Bassuk was the mastermind of the Enterprise.

86. Leto is responsible for the day-to-day operations of the Enterprise and together with Bassuk has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and repayment period of each usurious loan.

87. In Leto's capacity as mastermind of the Enterprise, Leto is responsible for creating, approving and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purpose of collecting unlawful debt, including: (i) the form of the agreements used by the Enterprise to attempt to disguise the interest charged on the unlawful

loans to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (ii) the method of collecting the daily payment via ACH withdrawals; (iii) the amounts of disguised interest that is asserted through the Enterprise's deceitful fees; and (iv) form affidavits, affirmations, and/or demand letters used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon unlawful loans including, without limitation, the loan extended to Plaintiff.

88. Leto has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including, directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

89. Upon information and belief, Leto also plays a significant role in the Enterprise's unlawful collection tactics, including directing the filing of knowingly false and/or fraudulent affidavits and/or affirmations in support of lawsuits against borrowers that misrepresent or omit material facts concerning the transaction.

90. Leto has ultimately benefitted from the Enterprise's illegal activities by funneling the usurious loan proceeds to Leto' own self and other participants in the Enterprise.

**2. Bassuk**

91. Bassuk has been the President and CEO of Idea 247 since January 2025, and together with Leto was the mastermind of the Enterprise.

92. As CEO, Bassuk is responsible for the day-to-day operations of the Enterprise and together with Bassuk has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which

investors will fund each loan and the ultimate payment terms, amount and repayment period of each usurious loan.

93. In Bassuk' capacity as mastermind of the Enterprise, Bassuk is responsible for creating, approving and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purpose of collecting unlawful debt, including: (i) the form of the Agreements used by the Enterprise to attempt to disguise the interest charged under the unlawful loans to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (ii) the method of collecting the daily payment via ACH withdrawals; (iii) the amounts of disguised interest that is asserted through the Enterprise's deceitful fees; and (iv) the form affidavits/affirmations and/or demand letters used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon unlawful loans including, without limitation, the loan extended to Plaintiff.

94. Bassuk has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including, directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

95. Upon information and belief, Bassuk also plays a significant role in the Enterprise's unlawful collection tactics, including directing the filing of knowingly false and/or fraudulent affidavits and/or affirmations in support of lawsuits against borrowers that misrepresent or omit material facts concerning the transaction.

96. Bassuk has ultimately benefitted from the Enterprise's illegal activities by funneling the usurious loan proceeds to Bassuk' own self and other participants in the Enterprise.

**3. Idea 247**

97. Idea 247 is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

98. Idea 247 participates and furthers the interests of the Enterprise by: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with investors to fund the usurious loans; (ii) pooling the funds of investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the loan Agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting-up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtaining judgments in its name to further collect upon the unlawful debt.

99. In this case Idea 247, through Leto and Bassuk, knowingly and intentionally: (i) solicited Debtor into entering into the Agreement; (ii) funded the Agreement; (iii) underwrote the Agreement; (iv) entered into the Agreement; and (v) collected upon the unlawful debt evidenced by the Agreement by effectuating weekly ACH withdrawals from Debtor's bank account.

**E. Interstate Commerce**

100. The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities.

101. Specifically, members of the Enterprise maintain offices in at least Florida, and use personnel in this office to originate, underwrite, fund, service and collect upon usurious loans made by the Enterprise to entities across the United States, including Debtor in Tennessee, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

102. In the present case, all communications between members of the Enterprise and Debtor were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service, and collect upon the Agreements, fund loans under each of the Agreements and collect payments via interstate electronic ACH debits.

103. In addition, at the direction of Defendants, the Agreement was sent from Florida and executed in Tennessee, where Debtor resides.

**F. Injury and Causation**

104. Debtor has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $315,640.20, the amount of unlawful debt collected by the Enterprise from Debtor.

105. The injuries to the Debtor are directly, proximately, and reasonably foreseeably resulting from or caused by Defendants' violations of 18 U.S.C. § 1962(c), including, but not limited to, hundreds of thousands of dollars in unlawfully collected criminally usurious loan payments.

106. Debtor has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

107. Pursuant to 18 U.S.C. § 1964(c), Debtor is entitled to treble damages, plus costs and attorneys' fees from Defendants.

**FIFTH CLAIM FOR RELIEF**
(Violations of RICO – 18 U.S.C. § 1962(b))

108. Plaintiff repeats and re-allege the allegations of each of the foregoing paragraphs.

109. Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

110. By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including with respect to the instant Agreement, each Defendant knew the nature of the Enterprise, and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

111. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, and/or operation of the Enterprise's affairs in order to collect upon unlawful debts pursuant to the Agreement.

112. The participation and agreement of each Defendant was necessary to allow the commission of this illegal scheme.

113. Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial, but no less than $315,640.20, the amount collected from Plaintiff.

114. The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused these violations 18 U.S.C. § 1962(d) include, but are not limited to, $315,640.20 in improperly collected loan payments.

115. Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

116. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A. To avoid the Agreement as a constructively fraudulent obligation under 11 U.S.C. § 548(a)(1)(B);

B. To avoid the constructively fraudulent transfers the Debtor made to the Defendant totaling $315,640.20 under 11 U.S.C. § 548(a)(1)(B);

C. To enter judgment in favor of the Plaintiff against the Defendants under 11 U.S.C. § 550(a) in the amount of the avoided transfers Defendants received;

D. To enter judgment in favor of the Plaintiff against the Defendants under 18 U.S.C. § 1964(c) in the amount of threefold the damages to be proven at trial, plus reasonable attorney fees;

E. To award pre-judgment and post-judgment interest at the maximum legal rate until paid in full, with such recovery being for the benefit of the Debtor's estate;

F. To tax the costs of this action against the Defendants; and,

G. For such other and further relief the Court deems just and proper.

Respectfully submitted this 19th day of September, 2025.

**HESKIN & PROPER, PLLC**
*/s/ Shane R. Heskin*
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, N.Y. 10022
shane@heskinproper.com
*Counsel for Plaintiff*