**IDEA 247, INC.**
**REVOLVING LOAN AGREEMENT**

This Revolving Loan Agreement (this “Agreement”) is entered into as of **11/9/2023** by and between **BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC** as borrower (“Borrower”), each party signatory hereto as a guarantor (each, a “Guarantor”, and together with Borrower, the “Obligors”) and **Idea 247, Inc.**, a Florida corporation, as lender (in such capacity, “Lender”).

**SECTION 1. TERMS; DEFINITIONS.** Lender is extending credit to Borrower pursuant to the loan application submitted by Borrower (the “Loan Application”).

1.1. Definitions; Interpretation. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Caption headings in the Agreement and the Loan Application are for convenience purposes only and are not to be used to interpret or define the provisions thereof. Words and terms not otherwise defined in the Agreement or the Loan Application shall have the meanings attributed to such terms in the Uniform Commercial Code or other applicable law. Accounting words and terms not otherwise defined in the Agreement or the Loan Application shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of the Agreement. Except where otherwise specifically provided or the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including any organizational document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth in the Agreement), (b) any reference to any person shall be construed to include such person’s successors and assigns, (c) the words “herein,” “hereof” and “hereunder,” and words of similar import when used in the Agreement shall be construed to refer to such document in its entirety and not to any particular provision thereof, (d) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (e) the words “asset” and “property” shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including without limitation cash, securities, accounts and contract rights, and (f) any reference in the Agreement to a period of “days” means calendar days and not business days, unless otherwise specified. Any ambiguities in the Agreement shall not be construed strictly against the drafter of the language concerned, but shall be resolved by applying the most reasonable interpretation under the circumstances, giving full consideration to the intentions of the parties at the time of contracting. The Agreement shall not be construed against any party by reason of its preparation.

1.2. Multiple Obligors. When the Agreement is executed by more than one Borrower or Guarantor, then the words “Borrower”, “Guarantor” and “Obligor” shall mean all and any one or more of them (as applicable), and their respective successors and assigns, including debtors-in-possession and bankruptcy trustees. The obligations of each Obligor under the Agreement are joint and several.

1.3. Obligations. In this Agreement, the term “obligations” is used in its most comprehensive sense and includes any and all debts, covenants, agreements, rental obligations and other obligations and liabilities of every kind of Borrower to Lender, whether made, incurred or created previously, concurrently or in the future, whether voluntary or involuntary and however arising, whether incurred directly, whether due or not due, absolute or contingent, liquidated or unliquidated, legal or equitable, whether Borrower is liable individually or jointly or with others, whether incurred before, during or after any bankruptcy, reorganization, insolvency, receivership or similar proceeding, and whether recovery thereof is or becomes barred by a statute of limitations or is or becomes otherwise unenforceable, together with all expenses of, for and incidental to collection, including reasonable attorneys’ fees.

**SECTION 2. AMOUNTS AND TERMS OF COMMITMENT.**

2.1. Revolving Loan Terms; Promise to Pay; Repayment Schedule and Amortization. Lender shall make a revolving loan (the “Revolving Loan”) to Borrower in one or more advances, which aggregate outstanding principal balance shall not at any time exceed **$211,000.00** (the “Maximum Commitment”). From time to time, from the date of this Agreement until **11/9/2024** (the "Commitment Period"), the Borrower may draw down on such Revolving Loan in one or more advances through the **Idea 247, Inc.** online borrower portal, in an aggregate principal amount up to the Maximum

Commitment. The Revolving Loan shall only be made for commercial purposes. From and after the date hereof, the Maximum Commitment may be reduced and/or future advances suspended at the reasonable discretion of the Lender and without prior notice to Borrower. In addition, future advances may be suspended at any time without prior notice to Borrower at the reasonable discretion of the Lender if, through its ongoing monitoring of Borrower's financial condition, Lender determines that there has been a material adverse change in Borrower's financial condition since the date of this Agreement or that an Event of Default has occurred and is continuing. On the date of each advance, (a) Borrower shall pay a drawdown fee of **2.99%** of the draw, which will be (i) fully earned at the time of the funding of the draw, (ii) considered part of the principal of the Revolving Loan and (iii) subject to the accrual of interest, and (b) Lender shall furnish a repayment schedule or, if applicable, a revised repayment schedule, setting forth the schedule, due dates and instructions for all payments of principal and interest and any charges and fees of amounts owed under the Revolving Loan (the "Repayment Schedule"). Each Repayment Schedule shall amortize the outstanding amounts owed under the Revolving Loan in equal **Weekly** installments over a **12** month period.

2.2. Interest. Interest on each advance accrues daily (the "Daily Interest Rate"), and all of the interest that accrues on an advance during a **week**, together with a portion of the principal amount of the advance amortized over the term of the advance, is due and payable after the end of each **week**. The due dates for payments on the first advance are the day following the last day of the first **week** of that advance and each **Weekly** anniversary thereafter, and the due dates for payments on all subsequent advances will be the same calendar day. For purposes of this Agreement, the word "week" means each period during the term of an advance of seven consecutive calendar days beginning on the day the amount of the advance is sent from Lender's account. The Daily Interest Rate shall be **0.0699%**, which corresponds to a Weekly rate of **0.4890%** (that is, the Daily Interest Rate multiplied by seven). The daily balance of an advance for each day is calculated by starting with the beginning balance of the advance that day, and then adding any interest, charges, fees and penalties and subtracting any payments or credits that day. Interest continues to accrue on an advance until the principal amount thereof, together with all accrued and unpaid interest, charges, fees, penalties, and any other obligations relating to the advance, are paid in full. From and after the date hereof, the Daily Interest Rate may be adjusted at the sole discretion of the Lender and without prior notice to Borrower; provided that at no time shall the Daily Interest Rate exceed the maximum rate allowed by law. Any amount added to principal pursuant to this Agreement shall bear interest from the date added to principal at the Daily Interest Rate and shall be payable with such interest upon demand by Lender and absent such demand, as provided in this Agreement for the payment of principal and interest.

2.3. Default Interest Rate. During any payment period in which an Event of Default is continuing, Borrower agrees that the Daily Interest Rate will be increased to **0.0836%**, which corresponds to a Weekly rate of **0.5849%** (that is, the increased Daily Interest Rate multiplied by seven). During any period in which such default interest is payable, it shall be applicable to all amounts outstanding under this Agreement, including principal and all other amounts added to the Revolving Loan balance under this Agreement or any other document executed in connection with this Agreement.

**SECTION 3. PAYMENTS.**

3.1. Payments Generally. As payments from Borrower are received, Lender shall apply such payments first to outstanding fees, second to accrued but unpaid interest, and finally to outstanding principal. All payments shall be made directly to Lender. Except as otherwise expressly provided herein or as may be otherwise required by Lender, all payments by Borrower hereunder shall be made (a) to Lender in U.S. dollars and in immediately available funds, (b) no later than 4:00 p.m. ET on the date specified herein and (c) at the office of Lender or at a different place or to a different person if required by Lender. All payments received by Lender after 4:00 p.m. ET shall be deemed received on the next succeeding business day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a business day, payment shall be made on the next following business day, and such extension of time shall be included in computing interest or fees, as the case may be. Borrower agrees that neither acceptance of a payment in an amount that is less than all amounts then due and payable nor application of such payment shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Borrower authorizes Lender to disburse any accumulated excess monies to Borrower's Designated Bank Account (as defined below).

3.2. Repayment and Maturity Date. Any outstanding principal amount of the Revolving Loan, together with any accrued but unpaid interest, charges, fees and penalties shall be due and payable in **12** months after the day of the most recent draw made by Borrower on the Revolving Loan (the "Maturity Date"). Borrower expressly authorizes Lender to initiate an electronic funds transfer ("EFT") debit from the account (the "EFT Bank Account") designated by Borrower in accordance with the Authorization Agreement for EFT Payments attached as Exhibit A (the "EFT Authorization") for all

amounts due and owing by Borrower to Lender under this Agreement or after the Maturity Date. In connection with such payments, Borrower further agrees to complete the EFT Authorization. This Agreement shall be effective as of the date first written above, and shall continue in full force and effect until such time as the Revolving Loan has been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges or until such time as the parties may agree in writing to terminate this Agreement. Each Obligor waives any statute of limitations applicable to this Agreement to the fullest extent permissible by law.

3.3. Other Accounts; Debit Card and Credit Card Authorization. In the event Lender initiates an EFT from the EFT Bank Account for any amounts due and owing from Borrower to Lender under this Agreement and there are insufficient funds to cover any or all of the amount due (including any fees, expenses, interest, and additional amounts owing in connection with this Agreement), Borrower hereby authorizes Lender to initiate an EFT from any other bank account of Borrower provided to Lender or of which Lender has knowledge. Borrower further authorizes Lender to charge any credit card or debit card Borrower has provided to Lender, or used for payment, or of which Lender has knowledge, to satisfy any remaining amounts due on a missed payment. Accounts subject to this authorization including an account accessed by a debit card do not include any bank accounts or other consumer asset accounts established primarily for personal, family or household purposes. This authorization shall remain in full force and effect until all amounts due and owing by under this Agreement have been satisfied in full, or until revoked by Borrower in writing to Lender.

3.4. Prepayments. Borrower has the right to prepay the Revolving Loan in whole or in part. Partial prepayments shall be applied first to outstanding fees, second to accrued but unpaid interest, and finally to outstanding principal.

3.5. Accord and Satisfaction. Borrower agrees not to send payments marked with any language such as "paid in full," "without recourse," or language to similar effect. If Borrower sends such a payment, Lender may accept it without losing any rights under this Agreement, and Borrower will remain fully obligated to pay all amounts due under this Agreement. All communications concerning disputed amounts, including any check or other payment instrument that seeks to effect an accord and satisfaction by indicating that the instrument is "payment in full" of the amount owed under this Agreement or is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Lender in accordance with Section 11.2.

3.6. Account Authorization. Borrower authorizes Lender (i) to disburse the Revolving Loan proceeds by EFT to the Designated Bank Account; and (ii) to debit the Designated Bank Account (including any subsequent Designated Bank Account identified to Lender by Borrower) by EFT for the amount of each payment due. Borrower authorizes Lender to resubmit any EFT debit authorized by Borrower that is returned for insufficient or uncollected funds, except as otherwise provided by NACHA – The Electronic Payment Association's EFT rules or applicable law.

3.7. Late Payments. Borrower agrees that Lender may assess a late charge equal to the greater of **$15.00** or **5.0%** of any payment under a Repayment Schedule not received by Lender on or before such payment is due. Borrower acknowledges that its failure to make timely payments will create additional expenses in servicing and processing the Revolving Loan and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that any late charge payable pursuant hereto represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Agreement, of the additional expenses Lender will incur by reason of such late payment. Borrower also understands that Borrower will pay more interest if Borrower does not make a payment by the date on which such payment is due under a Repayment Schedule.

3.8. Payment Failure. Borrower agrees that Lender may assess a payment failure fee equal to the greater of **$30.00** or **5.0%** of the amount due if any attempted payment by Borrower to Lender is not made for any reason, including when any check or payment instrument is not honored or cannot be processed or when EFTs fail due to insufficient funds, account closure, or other reasons beyond Lender's reasonable control. Any payment failure fee will be added to the balance due and payable on to the Maturity Date. Each business processing day in which a new non-payment occurs shall be deemed an "occurrence," with a maximum of one occurrence per day per deposit account, including single or multiple checks or drafts submitted or EFTs attempted for payment on the Maturity Date. For the avoidance of doubt, Lender has the right, but not the obligation, to attempt to process payment daily, whether by EFT or by other means.

3.9. Maximum Charges. Notwithstanding any provision in this Agreement to the contrary, if at any time and for any reason whatsoever the interest rate, fees, charges or penalties payable on the Revolving Loan shall exceed the maximum rate permitted by applicable law, the portion that exceeds the maximum rate permitted by applicable law shall be deemed a voluntary prepayment of principal.

3.10. Renewal Fee. In the event Lender renews Borrower's Loan, Borrower agrees to pay Lender a **$500.00** renewal fee, which amount will be deducted from the Designated Bank Account.

**SECTION 4. JOINT AND SEVERAL GUARANTY.**

4.1. Obligations Guarantied. For valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, each Guarantor jointly and severally, unconditionally and irrevocably guaranties to Lender (i) the due and prompt payment of all obligations of Borrower to Lender and (ii) the due and prompt performance of the obligations of Borrower to Lender.

4.2. Limitation on Guarantor's Liability. It is the intention of Lender and each Guarantor that the guaranty and obligations of such Guarantor under the Agreement not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law to the extent applicable to Agreement and the obligations of such Guarantor thereunder. The obligations of each Guarantor under the Agreement shall be limited to the maximum amount as will result in the obligations of such Guarantor under the Agreement not constituting a fraudulent transfer or conveyance.

4.3. Nature/Revocation/Reinstatement of Guaranty. The guaranty provided by each Guarantor is continuing and covers the Revolving Loan and all obligations of Borrower to Lender, including those arising under successive transactions which continue or increase such obligations from time to time, renew all or part of such obligations after they have been satisfied, or create new obligations. The guaranty provided by such Guarantor is a guaranty of payment and not of collection. All of Lender's rights pursuant to the Agreement continue with respect to amounts previously paid to Lender on account of any obligations which are thereafter restored or returned by Lender, whether in an insolvency proceeding of Borrower or for any other reason, all as though such amounts had not been paid to Lender; and each Guarantor's liability under the Agreement (and all its terms and provisions) shall be reinstated and revived, notwithstanding any surrender or cancellation of the Agreement. If any insolvency proceeding is commenced by or against Borrower or any Guarantor, at Lender's election, any Guarantor's obligations under the Agreement shall immediately and without notice or demand become due and payable, whether or not then otherwise due and payable.

4.4. Authorization. Each Guarantor authorizes Lender, without notice and without affecting such Guarantor's liability under the Agreement, from time to time, whether before or after any revocation of the Agreement, to (a) renew, compromise, extend, accelerate, release, subordinate, waive, amend and restate, or otherwise amend or change, the time or place for payment of all or any part of the obligations of Borrower under the Agreement; (b) accept delinquent or partial payments; (c) take or not take security or other credit support for the Revolving Loan and exchange, enforce, waive, release, subordinate, fail to enforce or perfect, sell or otherwise dispose of any security or credit support; (d) apply proceeds of any security or credit support and direct the order or manner of its sale or enforcement as Lender, at its sole discretion, may determine; and (e) release or substitute Borrower or any guarantor or other person or entity liable in respect of the Revolving Loan.

4.5. Guarantor Waivers.

a. To the maximum extent permitted by law, each Guarantor unconditionally and irrevocably waives (i) all rights to require Lender to proceed against Borrower, or any other guarantor, or proceed against, enforce or exhaust any security for the Revolving Loan or to marshal assets or to pursue any other remedy in Lender's power whatsoever; (ii) all defenses arising by reason of any disability or other defense of Borrower, the cessation for any reason of the liability of Borrower, any defense that any other indemnity, guaranty or security was to be obtained, any claim that Lender has made such Guarantor's obligations more burdensome or more burdensome than Borrower's obligations, and the use of any proceeds of the Revolving Loan other than as intended or understood by Lender or such Guarantor; (iii) all presentments, demands for performance, notices of nonperformance, protests, notices of dishonor, notices of acceptance of the Agreement and of the existence or creation of new or additional obligations of Borrower, and all other notices or demands to which such Guarantor might otherwise be entitled; (iv) all conditions precedent to the effectiveness of the Agreement; (v) all rights to file a claim in connection with Borrower's obligations in an insolvency proceeding filed by or against Borrower; (vi) all rights to require Lender to enforce any of its remedies; (vii) until the obligations under the Agreement are satisfied and the Revolving Loan is fully paid with such payment not subject to return: (A) all rights of subrogation, contribution, indemnification or reimbursement, (B) all rights of recourse to any assets or property of Borrower, or to any Collateral or credit support for the Revolving Loan,

(C) all rights to participate in or benefit from any security or credit support Lender may have or acquire, and (D) all rights, remedies and defenses such Guarantor may have or acquire against Borrower, including but not limited to any defense based on any right of set-off or recoupment or counterclaim against or in respect of the obligations of such Guarantor under the Agreement; and (viii) promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to the Revolving Loan and the Agreement and any requirement that Lender protect, secure, perfect or insure any lien or any property subject thereto.

b. Each Guarantor waives any defense that such Guarantor may have by reason of the failure of Lender to provide such Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower’s ability to perform its obligations under the Agreement or the sufficiency of Lender’s Collateral.

c. Each Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

4.6. Each Guarantor to Keep Informed. Each Guarantor warrants having established with Borrower adequate means of obtaining, on an ongoing basis, such information as such Guarantor may require concerning all matters bearing on the risk of nonpayment of the Revolving Loan or nonperformance of Borrower’s obligations under the Agreement. Each Guarantor assumes sole, continuing responsibility for obtaining such information from sources other than from Lender. Lender has no duty to provide any information to any Guarantor until Lender receives such Guarantor’s written request for specific information in Lender’s possession and Borrower has authorized Lender to disclose such information to such Guarantor.

4.7. Subordination. All obligations of Borrower to any Guarantor which presently or in the future may exist shall be subordinated to Borrower’s obligations to Lender. At Lender’s request, any Guarantor’s claims against Borrower will be enforced and performance thereon received by the relevant Guarantor only as a trustee for Lender, and such Guarantor will promptly pay over to Lender all proceeds recovered for application to the Revolving Loan without reducing or affecting such Guarantor’s liability under other provisions of the Agreement.

**SECTION 5. SECURITY INTEREST.**

5.1. Grant of Security Interest. To secure payment of all indebtedness owed to Lender and performance of all other obligations under this Agreement and for other valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, each Obligor grants to Lender a security interest in all of its present and future right, title and interest in and to all of its assets, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, together with all proceeds and products thereof (the “Collateral”), including without limitation:

a. All trade fixtures and personal property of every kind and nature, including all accounts (including but not limited to all receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letter-of-credit rights, letters of credit, securities and all other investment property, general intangibles (including but not limited to all software and all payment intangibles), money, deposit accounts, motor vehicles, commercial tort claims identified to Lender from time to time, other rights to payment and performance, contract rights or rights to the payment of money and other obligations of any kind; and

b. All of such Obligor’s present and future right, title and interest in and to all of the following property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(1) All accessions, attachments, accessories, fittings, increases, tools, parts, repairs, supplies, replacements of, additions to and commingled goods related to any of the property described in this paragraph, whether added now or later;

(2) All additions, replacements of and substitutions for all or any part of the property described in this paragraph, whether added now or later;

(3) All products and produce of any of the property described in this paragraph;

(4) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this paragraph;

(5) All good will relating to the property described in this paragraph;

(6) All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any of the property described in this paragraph, and sums due from a third party who has damaged or destroyed such collateral or from that party's insurer, whether due to judgment, settlement or other process;

(7) All records and data and embedded software relating to any of the property described in this paragraph, in any medium whatever, together with all of such Obligor's right, title, and interest in and to all equipment, inventory and computer software required to utilize, create, maintain, and process any such records or data on electronic media;

(8) All supporting obligations relating to the property described in this paragraph, whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the property described in this paragraph; and

(9) All products and proceeds (including but not limited to all insurance payments) of or relating to the property described in this paragraph.

c. Any and all real property.

5.2. Perfection of Security Interest. Each Obligor authorizes Lender to file Uniform Commercial Code financing statements or any other form, document or notice, or a copy of the Agreement, to perfect Lender's security interest in any Collateral. At Lender's request, each Obligor agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Collateral. Each Obligor irrevocably appoints Lender as its attorney-in-fact, with full authority in its place and stead, to execute documents necessary to transfer title upon the occurrence of an Event of Default. The foregoing power of attorney is coupled with an interest and shall survive the termination of this Agreement until the Obligations are indefeasibly paid in full.

5.3. Further Assurances. Each Obligor shall make, execute and deliver to Lender such documents and take such other actions as Lender may reasonably request to evidence and secure the Revolving Loan, to perfect Lender's security interests in the Collateral securing the Revolving Loan and to protect Lender's interests in the Revolving Loan and such Collateral.

**SECTION 6. REPRESENTATIONS AND WARRANTIES.**

6.1. Representations and Warranties. To induce Lender to enter into the Agreement and to make the Revolving Loan, each Obligor represents and warrants to Lender as of the date of the Agreement and at all times the Revolving Loan exists that:

a. if it is a corporation, limited liability company or partnership, (i) it is duly organized, validly existing and in good standing under the laws of its state of organization; (ii) it has full power and authority to enter into the transactions provided for in the Agreement; (iii) it is duly authorized to execute, deliver and perform its obligations under the Agreement; and (iv) the execution, delivery and performance of the Agreement do not breach (1) any provision of its organizational documents, (2) any agreement or other instrument binding upon it or (3) any applicable law;

b. it is duly authorized to transact business in all states in which it is doing business;

c. it is in compliance with all laws applicable to or binding upon it or any of its property or to which it or any of its property is subject;

d. the Agreement constitutes a legal, valid and binding obligation enforceable against such Obligor in accordance with its terms;

e. no litigation, claim, investigation, proceeding or similar action is pending or threatened against it, and no other event has occurred which may materially adversely affect its financial condition, properties or ability to repay the Revolving Loan;

f. all of its tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those currently being or to be contested by it in good faith in the ordinary course of business and for which adequate reserves have been provided;

g. the proceeds of the Revolving Loan will not be used for “purchasing” or “carrying” any “margin stock” within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time in effect or for any purpose which violates the provisions of the Regulations of such Board of Governors;

h. it is not and is not required to be registered as an “investment company” under the Investment Company Act of 1940, as amended, and is not subject to regulation under any law that limits its ability to incur debt or which may otherwise render all or any portion of the obligations hereunder unenforceable;

i. as of the date of the Agreement and after giving effect to the transactions contemplated by the Agreement, (i) the aggregate value of each Obligor’s assets will exceed its liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), (ii) each Obligor will have sufficient cash flow to enable it to pay its debts as they become due, and (iii) no Obligor will have unreasonably small capital for the business in which it is engaged;

j. it owns and has good title to all Collateral free and clear of all security interests other than those which may have been disclosed to Lender in the Loan Application or otherwise prior to the execution of the Agreement in writing;

k. the pledge of the Collateral pursuant to the Agreement creates a valid and perfected security interest therein in favor of Lender, securing the payment and performance when due of the obligations under the Agreement;

l. the Revolving Loan is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes; and

m. neither it nor any of its affiliates or officers, directors, brokers or agents (i) has violated any anti-terrorism laws, (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development’s Financial Action Task Force on Money Laundering, (iii) is publicly identified on the most current list of “Specially Designated Nationals and Blocked Persons” published by the Office of Foreign Assets Control of the US Department of the Treasury (“OFAC”) or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, (iv) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other law, (v) conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any person described in clauses (iii) or (iv) above, (vi) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any anti-terrorism law or (vii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any anti-terrorism law.

n. it has read, and understands and agrees to comply with the Terms of Service (the “TOS”) set forth on Lender’s website (www.ideafinancial.com), as amended from time to time, and hereby incorporated herein by this reference (to the extent there is a conflict between the provisions in the TOS and this Agreement, the provisions in this Agreement shall govern).

6.2. Survival of Representations and Warranties. Each Obligor understands and agrees that in making the Revolving Loan, Lender is relying on all representations, warranties and covenants made by the Obligors in the Agreement and in any document, certificate or other instrument delivered by the Obligors to Lender under the Agreement. Each Obligor further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the execution of the Agreement and the funding of the Revolving Loan, shall be continuing in nature, and shall remain in full force and effect until such time as all of the Obligors' obligations under the Agreement shall be fully satisfied, or until the Agreement shall be terminated, whichever is the last to occur.

**SECTION 7. AFFIRMATIVE COVENANTS.**

7.1. Each Obligor covenants and agrees with Lender that, so long as the Agreement remains in effect, it will:

a. comply with all terms and conditions of the Agreement and any other agreement, whether now or hereafter existing, between it and Lender;

b. preserve and keep in full force and effect its existence, rights and privileges, and comply with all laws applicable to it and its business activities;

c. comply with all laws applicable to it and its properties, business and operations;

d. keep and maintain its property in good order, repair and condition;

e. permit Lender or its agents to inspect and make copies of its properties or books, accounts and records;

f. promptly inform Lender in writing of (i) any material adverse change in its financial condition (including, but not limited to, any loss or change of employment) or in any financial or personal information previously provided to Lender, (ii) any existing or threatened litigation, claims, investigations, administrative proceedings or similar actions affecting it which could materially affect its financial condition, (iii) any default in connection with the Agreement, (iv) the description and location of its personal property upon request of Lender, and (v) any loss or damage to the Collateral;

g. furnish Lender, at Lender's request, with (i) Borrower's balance sheet and income statement prepared by Borrower on an annual basis; (ii) Borrower's federal and other governmental tax returns; and (iii) such additional financial and operational information and statements as Lender may request from time to time; and

h. authorize Lender to (i) obtain and receive credit reports and related information about such Obligor on a continuous basis from one or more consumer credit reporting agencies, such as Experian, Equifax, and TransUnion, (ii) monitor on a continuous basis each Designated Bank Account (iii) provide on behalf of such Obligor certain elements of the Loan Application, and elements derived in whole or in part from certain elements of the Loan Application, to its affiliates and potential investors in Lender or its affiliates (including without limitation, using credit scores of any Obligor in the evaluation of a credit request by Borrower), (iv) use such credit reports and information in connection with the servicing, monitoring, collection or enforcement of the Revolving Loan, and (v) report information about the account to consumer credit bureaus (including without limitation, late payments, missed payments, or other defaults on the account). To limit Lender's sharing of such information, please contact Lender at **200 SE 1st St., Suite 703, Miami, FL 33131** .

i. file all tax returns and reports that are required to be filed and pay all taxes, assessments and other governmental charges in full, except those contested by it in good faith in the ordinary course of business and for which adequate reserves are provided.

7.2. Designated Bank Account; Online Banking Access. Borrower shall advise Lender of all bank accounts in its name. Borrower shall provide Lender continuous, uninterrupted online access to the Designated Bank Account and shall inform Lender in advance of any changes (e.g. changes to login credentials) that may interrupt such access. Such access shall include, without limitation, the ability to view current balances and monthly banking statements. To the extent Lender is unable to access online the Designated Bank Account, upon notification by Lender, Borrower shall promptly (but in no event longer than five (5) days after receipt of notice from Lender regarding lack of access) restore access to Lender. If Borrower is unable to restore access to Lender due to unresolvable technological issues, until such

access is resolved Borrower shall provide Lender with real-time information on the Designated Bank Account as a condition of future advances. "Designated Bank Account" means the following bank account in Borrower's name: **064008637-800105086938**.

7.3. Insurance. Each Obligor shall procure and maintain "all risks" insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Each Obligor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form and substance satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of any Obligor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, each Obligor will provide Lender with such loss payable or other endorsements as Lender may require. If any Obligor at any time fails to obtain or maintain any insurance as required hereunder, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including, in Lender's sole discretion, "single interest insurance," which will cover only Lender's interest in the Collateral, and the cost paid by Lender for such purpose will bear interest at the rate charged under the Agreement from the date incurred or paid by Lender to the date of repayment by the relevant Obligor. Lender may make proof of loss if any Obligor fails to do so within fifteen (15) days of any casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse the relevant Obligor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the indebtedness under the Agreement, and shall pay the balance to the relevant Obligor. Any proceeds which have not been applied to the repair or restoration of the Collateral within six (6) months after their receipt shall be used to repay indebtedness under the Agreement.

**SECTION 8. NEGATIVE COVENANTS.**

8.1. Each Obligor covenants and agrees with Lender that, so long as the Agreement remains in effect, it will not:

a. change its name or state of organization or residence, as applicable, without giving Lender at least thirty (30) days' prior written notice;

b. compromise, settle, adjust or extend payment under or with regard to any of its accounts other than in the ordinary course of business;

c. sell, transfer or dispose of its assets other than in the ordinary course of business;

d. except in connection with another financing agreement or arrangement with Lender, (i) create, incur, maintain or assume any Additional Indebtedness (including contingent indebtedness) other than trade debt incurred in the normal course of business or (ii) mortgage, assign, pledge, lease, grant a security interest in or encumber any of its assets. "Additional Indebtedness" includes any financing agreement or arrangement that was (A) not existing on the date the Revolving Loan was extended by Lender and (B) was not previously disclosed and approved in writing by Lender, including without limitation, any invoice financing, factoring, merchant cash advances, term loans, equipment financing, lines of credit (or overdrawn amounts on existing lines of credit), or any other legal obligation for repayment on additional debt.

e. cease operations or engage in any materially different business activities other than those disclosed in the Loan Application;

f. merge or consolidate with any other entity;

g. loan to or invest in any other enterprise or entity;

h. store any Collateral (including any records concerning such Collateral) at any address other than as provided to Lender in writing; or

i. enter into any transactions other than on arm's length terms.

**SECTION 9. EVENTS OF DEFAULT; REMEDIES**

9.1. Each of the following shall constitute an "Event of Default" under the Agreement:

a. any Obligor fails to make any payment when due under the Agreement;

b. any Obligor fails to comply with or to perform any other term, obligation, covenant or condition contained in the Agreement;

c. any warranty, representation or statement made or furnished to Lender by or on behalf of any Obligor is false or misleading, either at the time made or furnished or at any time thereafter;

d. the dissolution or termination of any Obligor's existence as a going business, the insolvency of any Obligor, the appointment of a receiver for any part of any Obligor's property, any assignment for the benefit of creditors, any type of creditor workout, the commencement of any proceeding under any bankruptcy or insolvency laws by or against any Obligor or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by Lender;

e. the Agreement or any related document ceases to be in full force and effect to create or retain a valid and perfected security interest or lien in any Collateral at any time and for any reason;

f. a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt;

g. commencement of foreclosure or forfeiture proceedings of any kind by any creditor of an Obligor or by any governmental agency against any Collateral securing the Revolving Loan;

h. the entry of a final judgment against any Obligor and the failure of such Obligor to discharge the judgment within ten (10) days of the entry thereof;

i. any Obligor dies, becomes incompetent, ceases to exist or revokes or disputes the validity of, or liability under, any guaranty of the Revolving Loan, the Agreement or any related document;

j. any change in ownership of twenty-five percent (25%) or more of the equity interests of any Obligor;

k. a material adverse change occurs in the financial condition of any Obligor, or Lender determines the prospect of payment or performance of the Revolving Loan is impaired;

l. any loss or change of employment or in any material adverse change in any financial or personal information previously provided to Lender; and

m. the existence of any litigation (threatened or otherwise), claims, investigations, administrative proceedings or similar actions affecting Obligor which could materially affect Obligor's financial condition.

9.2. Effect of an Event of Default. If any Event of Default shall occur, all commitments and obligations of Lender under the Agreement or any other agreement immediately will terminate (including any obligation to make further advances or disbursements) and, at Lender's option, the Revolving Loan will become immediately due and payable, all without notice of any kind to any Obligor, except that in the case of any "insolvency" Event of Default, such acceleration shall be automatic and not optional. Obligors authorize Lender (or its agents) to retrieve funds through an EFT from a Designated Bank Account(s) to apply to any unpaid obligations due under this Agreement.

9.3. Lender's Rights upon an Event of Default. In addition to the acceleration provisions set forth above, upon the occurrence and continuation of an Event of Default, Lender may exercise any and all rights, options and remedies provided for in the Agreement or any related document, under the Uniform Commercial Code, any other applicable foreign or domestic laws or otherwise at law or in equity. Except as may be prohibited by applicable law, all of Lender's

rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Obligor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

9.4. Lender's Collection and Enforcement. Upon the occurrence and continuation of an Event of Default, in addition to the rights specified in Section 9.3 above, Lender may exercise those rights specified in Section 8.9A-607 (Collection and Enforcement by Secured Party) of the Commercial Code of Virginia. Each Obligor expressly acknowledges and agrees that the exercise of such rights may entail Lender contacting Borrower's debtors, depositary banks or other financial institutions, or credit card processors and instructing such parties to redirect future payments owed to Borrower to an account specified by Lender until the obligations hereunder have been indefeasibly satisfied in full.

9.5. Further Assurances. Each Obligor shall make, execute and deliver to Lender such documents and take such other actions as Lender may reasonably request to assist Lender in exercising all of it rights, options and remedies provided for in the Agreement upon the occurrence and continuation of an Event of Default.

9.6. No Waiver by Lender. Each Obligor agrees that Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and a Guarantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or a Guarantor's obligations as to any future transactions. No partial exercise by Lender of any right or remedy hereunder shall preclude any other or further exercise of any such right or the exercise of any other remedy. The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender. Enforcement by Lender of any security for Borrower's obligations under this Agreement shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**SECTION 10. INDEMNIFICATION; EXPENSES.**

10.1. Indemnity. Each Obligor shall indemnify Lender, its affiliates and each Related Person (as defined below) (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including (x) the fees, charges and disbursements of any counsel for any Indemnitee, (y) mortgage, recording or similar taxes payable in connection with recording or filing any document or that may have been assessed as a result of events that occurred prior to the date of the Agreement and (z) environmental claims), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any person (including any Obligor) other than such Indemnitee arising out of, in connection with, or as a result of (a) the execution or delivery of the Agreement or any agreement or instrument contemplated thereby, the performance by the parties to the Agreement of their respective obligations thereunder or the consummation of the transactions contemplated thereby, (b) the Revolving Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by an Obligor or any of its affiliates, or any environmental liability related in any way to an Obligor or any of its affiliates, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by an Obligor or any directors, shareholders or creditors of an Obligor, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated under the Agreement is consummated, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee. This obligation to indemnify and defend the Indemnitees shall survive the repayment of the Revolving Loan and the termination of the Agreement.

10.2. Expenses; Attorneys' Fees. Upon the occurrence of an Event of Default, Obligor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and legal expenses (including in-house counsel) incurred in connection with the negotiation, documentation or enforcement of the Agreement. Obligor shall also pay all

filing fees, title transfer fees, and other fees and costs involved in perfecting its security interest in any Collateral, unless prohibited by law or unless Lender is required by law to pay such fees and costs, as well as all court costs and such additional fees as may be directed by any court in respect of the Agreement.

10.3. Self-Help. If any Obligor fails to comply with any provision of the Agreement, Lender may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving such Collateral. All such expenditures incurred or paid by Lender for such purposes will bear interest at the rate charged under the Agreement from the date incurred or paid by Lender to the date of repayment by the relevant Obligor. All such expenses will become a part of the Revolving Loan and, at Lender's option, will (i) be payable on demand; (ii) be added to the balance of the Revolving Loan; or (iii) be treated as a balloon payment which will be due and payable at the Revolving Loan's maturity.

10.4. Broker Compensation. Borrower will be responsible for any compensation payable by Borrower directly to any broker pursuant to a separate written agreement in connection with originating the Revolving Loan. In no case will Lender reimburse Borrower for any amounts paid or owed by Borrower to a broker related to the Revolving Loan.

10.5. Preference Payments. Any monies Lender pays because of an asserted preference claim in Borrower's bankruptcy will become a part of the Revolving Loan and, at Lender's option, shall be payable by Borrower as provided in the Agreement.

**SECTION 11. MISCELLANEOUS.**

11.1. Amendment. No amendment of any provision of this Agreement, and no consent to any departure by any Obligor therefrom, shall be effective unless in writing signed by Lender and Borrower.

11.2. Notices. Any notice required to be given under the Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by e-mail (unless otherwise required by law), when delivered to a nationally-recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown in the Loan Application. Any party may change its address for notices under the Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, each Obligor agrees to keep Lender informed at all times of its current address. Unless otherwise provided or required by law, if there is more than one Obligor, any notice given by Lender to Borrower is deemed to be notice given to all Obligors. Unless otherwise expressly provided herein, any notice given by Borrower to Lender shall be sent to Lender. Lender's address for notice purposes is as follows:

Idea 247, Inc.
c/o Justin Leto

200 SE 1st St.
Suite 703
Miami, FL 33131

e-mail: info@ideafinancial.com

11.3. Transferable Record. Each Obligor expressly agrees that this Agreement is a "transferable record" as defined in applicable law relating to electronic transactions and that it may be created, authenticated, stored, transmitted and transferred in a manner consistent with and permitted by such applicable law.

11.4. Consent to Transfer. Each Obligor agrees and consents to Lender's assignment, sale or transfer of all or part of Lender's interests in the Revolving Loan. Lender may provide, without any limitation whatsoever, to any one or more purchasers or potential purchasers, any information or knowledge Lender may have about any Obligor or about any other matter relating to the Revolving Loan, and each Obligor hereby waives any rights to privacy such Obligor may have with respect to such matters. Each Obligor additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Each Obligor also agrees that the purchasers of any such interests will be considered as the absolute owners of such interests in the Revolving Loan and will have all the rights granted in this Agreement as to such interests. Each Obligor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and

unconditionally agrees that either Lender or such purchaser may enforce such Obligor's obligations under the Revolving Loan regardless of the failure or insolvency of any holder of any interest in the Revolving Loan. Each Obligor further agrees that the purchaser of any such interests may enforce its interests regardless of any personal claims or defenses that such Obligor may have against Lender.

11.5. Successors and Assigns. All representations, warranties, covenants and agreements by or on behalf of the Obligors contained in this Agreement shall bind their respective successors and assigns and shall inure to the benefit of Lender and its successors and assigns. No Obligor shall, however, have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

11.6. Subsidiaries and Affiliates of Obligors. To the extent the context of any provisions of the Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the words "Borrower", "Guarantor" and "Obligor" as used in the Agreement shall include all of such person's subsidiaries and affiliates. Notwithstanding the foregoing, under no circumstances shall the Agreement be construed to require Lender to make any Revolving Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

11.7. Governing Law; Venue. THIS AGREEMENT, INCLUDING LICENSING AND USURY MATTERS, WILL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF VIRGINIA, WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS. EACH OBLIGOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST LENDER OR OF THEIR RESPECTIVE AFFILIATES OR ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, TRUSTEE, ADMINISTRATOR, MANAGER, ADVISOR AND REPRESENTATIVE OF LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES (COLLECTIVELY, "RELATED PERSONS") IN ANY WAY RELATING TO THIS AGREEMENT OR ANY RELATED DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO IN ANY FORUM OTHER THAN THE COURTS OF THE COMMONWEALTH OF VIRGINIA SITTING IN THE RICHMOND CIRCUIT COURT, 13TH JUDICIAL CIRCUIT OF VIRGINIA COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE EASTERN DISTRICT OF VIRGINIA, AND ANY APPELLATE COURT FROM ANY THEREOF. EACH OBLIGOR IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH VIRGINIA COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OBLIGOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER DOCUMENT SHALL AFFECT ANY RIGHT THAT LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY OBLIGOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION. EACH OBLIGOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED DOCUMENT IN ANY COURT DESCRIBED ABOVE. EACH OBLIGOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT. EACH OBLIGOR UNDERSTANDS THAT AGREEING TO THE APPLICABILITY OF VIRGINIA LAW AND VENUE IS A MATERIAL FACTOR IN LENDER'S WILLINGNESS TO ENTER INTO THIS AGREEMENT.

11.8. Waiver of Jury Trial. EACH OBLIGOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

11.9. Severability. If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable as to any other circumstance. If feasible, the unenforceable provision shall be considered modified so that it becomes legal, valid and enforceable. If the unenforceable provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

11.10. Execution. This Agreement may be executed by electronic signature and shall become effective when it shall have been executed by the parties hereto. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic (i.e., ‘pdf’ or ‘tif’) format shall be effective as delivery of a manually executed counterpart of this Agreement.

11.11. Time is of the Essence. Time is of the essence in the performance of this Agreement.

11.12. Entire Agreement. This Agreement (together with the Loan Application and TOS) constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

11.13. USA Patriot Act Notice. Lender hereby notifies each Obligor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the “Act”), it may be required to obtain, verify and record information that identifies such Obligor, which information includes the name and address of such Obligor and other information that will allow Lender to identify such Obligor in accordance with the Act.

Wherefore, the parties hereto have caused this Agreement to be duly executed as of the date first above written:

**BORROWER**

**BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC**

By: *Craig Brewer*
Name: Craig Brewer

**LENDER**

**Idea 247, Inc.**

A Florida corporation

By: *Justin Leto*
Name: Justin Leto

**GUARANTORS**

By: *Craig Brewer*
Name: Craig Brewer

**EXHIBIT A**

**Authorization Agreement for Electronic Funds Transfer (EFT)**

This Authorization Agreement for Electronic Funds Transfers (EFT) is part of (and incorporated by reference into) your Revolving Loan Agreement. Capitalized terms used but not defined herein are defined in your Revolving Loan Agreement.

Please complete this Authorization and return to us via email at info@ideafinancial.com. Please also retain a copy for your records.

**DIRECT PAYMENTS.** By signing below, I authorize Lender to initiate electronic fund transfers (each, an "EFT") from the bank account designated below (the "Designated Bank Account") for the amount due and owing by Borrower to Lender under the Agreement at any time prior to or after the Maturity Date. I authorize Lender to adjust the amount of any EFT, or to initiate multiple EFTs, for any outstanding payment(s) and any unpaid fees, expenses, interest or additional amounts as set forth in the Agreement. I agree to maintain sufficient funds in the Designated Bank Account to pay the amounts required under the terms of the Agreement. This Authorization is to remain in full force and effect until all amounts due and owing by Borrower to Lender under the Agreement on the Maturity Date have been indefeasibly paid in full.

**DIRECT DEPOSITS.** By signing below, I authorize Lender to electronically credit the Designated Bank Account to disburse the Revolving Loan proceeds to me pursuant to the Agreement. This Authorization is to remain in full force until advances are no longer permitted pursuant to the Agreement.

**BUSINESS PURPOSE ACCOUNT.** I attest that the Designated Bank Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** I agree to promptly notify Lender in writing if there are any changes to the account or routing number of the Designated Bank Account.

**OTHER BANK ACCOUNT(S), DEBIT CARD, AND CREDIT CARD AUTHORIZATION.** Pursuant to Section 3.3 of the Revolving Loan Agreement, in the event Lender initiates an EFT from the Designated Bank Account and there are insufficient funds to cover the amount due, I hereby authorize Lender to initiate an EFT from any other bank account I have provided to Lender or of which Lender has knowledge, including the accounts listed on Schedule I hereto, and I further authorize Lender to charge any credit card or debit card I have provided to Lender, or used for payment, or of which Lender has knowledge, to satisfy any remaining amounts due on a missed payment (collectively, the "Alternative Accounts Authorization"). Accounts subject to this authorization including an account accessed by a debit card do not include any bank accounts or other consumer asset accounts established primarily for personal, family or household purposes. The Alternative Accounts Authorization shall remain in full force and effect until all amounts due and owing to Lender under the Revolving Loan Agreement have been satisfied in full, or until revoked by me in writing to Lender.

**MISCELLANEOUS.** The Lender is not responsible for any fees charged by my bank as the result of debits initiated under this Authorization. Further, I agree not to hold Lender, its officers, directors, managers or affiliates responsible for any delay or loss of funds due to incorrect or incomplete information supplied by me or by my financial institution or due to an error on the part of my financial institution in depositing funds to my account. I agree that each EFT will comply with all applicable U.S. law.

**Designated Bank Account**
Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800105086938
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC
Tax ID number: 475334088

Signature: *Craig Brewer*
Date: 11/9/2023

SCHEDULE I

OTHER BANK ACCOUNTS

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800105086938
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800107222044
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800107222234
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800108642380
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800108143967
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800105087050
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC

Depository name: Pinnacle Financial Partners - TN
Routing number: 064008637
Account number: 800106289390
Business account holder name: BREWER'S LAWN CARE AND PROPERTY PRESERVATION LLC